IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
(Dallas Division)

| | | |
|---|---|---|
| ANNEMIEKE DEMAGGIO and | § | |
| ANTHONY DEMAGGIO | § | |
| | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| DAVA ONCOLOGY, L.P., | § | |
| VINAY JAIN, AND MARK LEVONYAK | § | |
| | § | |
|     Defendants. | § | |

---

**PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR A
PRELIMINARY INJUNCTION AND OTHER RELIEF**

---

*Submitted By*

THE LAW OFFICE OF JACK WALSH

**John P. Walsh, Esq.**
State Bar No. 24048867
III Lincoln Centre
5430 LBJ Freeway, Suite 1200
Dallas, TX 75240

**Tel**: 214-773-9167
**Fax**: 214-299-8668
**Email**: jwalsh@lean-lawyering.com
ATTORNEY FOR PLAINTIFFS

THE WADE LAW FIRM

**Wm. Kim Wade, Esq.**
State Bar No. 20642100
12700 Preston Road, Suite 265
Dallas, Texas 75230

**Tel**: 214-346-2946
**Fax**: 214-346-2947
**Email**: kwade@wadelaw.com
ATTORNEY FOR PLAINTIFFS

## I.     INTRODUCTION

The Plaintiffs, **Annemieke DeMaggio,** a Ph.D in Molecular Genetics (**"Annemieke"**), and her husband, **Anthony "Tony" DeMaggio ("DeMaggio")** (collectively, the **"Plaintiffs"**), hereby file this *Verified Original Petition and Application for Preliminary Injunction and Other Relief* against the Defendants, **Dava Oncology, L.P.** (**"Dava"** or **"Dava Oncology"**), a Texas Limited Partnership, **Vinay Jain ("Jain")**, the Chief Executive Officer of Dava, and **Mark Levonyak ("Levonyak")**, the President of Dava Oncology (collectively, the **"Defendants"**), to recover damages and injunctive relief associated with, *inter alia*, **copyright infringement**, **wrongful termination**, and **fraud,** by alleging the following:

## II.     SUMMARY OF LAWSUIT

1.     **The Phantom Equity Fraud**. The Plaintiffs, Annemieke and DeMaggio, have sued the Defendants because Dava's CEO (Jain) and President (Levonyak) have usurped the Plaintiffs' intellectual property and equity interest in Dava Oncology with false promises of "phantom equity" (the **"Phantom Equity"**). In 2007, Jain and Levonyak convinced Annemieke to shut down her successful biotech consulting firm in Seattle to join them as a co-founder in a new biotech firm in Dallas, Texas. Given that Annemieke would have to move her family to Texas and take a significant pay cut to join Dava Oncology, they promised her that it would be worth the risk because she would have "a piece of the upside" when the company matured and was sold in about four to six years. For the next six years, Annemieke worked tirelessly to build Dava Oncology into a successful strategic consulting firm that produced sophisticated products sought by the largest biotech firms in the cancer research industry. In particular, Annemieke and DeMaggio, an unpaid consultant who was also promised Phantom Equity by the Defendants, created a series of cutting-

edge cancer reference guides for specific cancer types and specific biological pathways (the **"Cancer Reference Guides"**). While Annemieke created the written text of these cancer resources, DeMaggio utilized his computer programming expertise to transform them into sophisticated electronic products that could be downloaded onto a client web-portal or an electronic tablet like the iPad. DeMaggio even created a tablet application (or App) to install these resources onto the iPad. For their work, Annemieke and DeMaggio accumulated the largest block of Phantom Equity within Dava Oncology. But none of it mattered because the Defendants canceled the Plaintiffs' Phantom Equity just as Dava Oncology was being sold.

2.    **Defendants Cancel Plaintiffs' Phantom Equity**. While Jain and Levonyak often promised Annemieke that her years of hard work would pay off when the company was sold, none of what they promised was true once Dava Oncology was put up for sale in 2012. As Annemieke worked feverishly to finish her work on the Cancer Reference Guides by the end of 2012, Jain and Levonyak engaged with a publishing expert to transform her work into a subscription series that was designed to enhance the pending sale of Dava Oncology. At the same time, Jain and Levonyak decided that Annemieke was expendable because her creation of the Cancer Reference Guides was now complete. So, within a week of finishing her work at the end of 2012, the Defendants wrongfully terminated Annemieke and canceled the entire block of Phantom Equity held by her and DeMaggio. The Plaintiffs lost everything they had worked for just as the company was in the process of being sold.

3.    **DeMaggio Owns Copyrights.** DeMaggio owns all of the copyright interests associated with his computer programming work incorporated into the Cancer Reference Guides, as well as the other computer work utilized by the Defendants. In 2008, Jain and Levonyak

promised DeMaggio that they would issue him Phantom Equity in return for his computer work on various projects. The Defendants labeled him a "consultant." Over the next five years, DeMaggio worked extensively with Annemieke to leverage technology to improve the communication of Annemieke's written work. Indeed, Levonyak had recognized DeMaggio's ability to create the "wow factor" for important projects: "This is a million dollar project so it has to look like one...Tony [DeMaggio] I have you copied [on this email] as well because you can put the **wow factor** into the equation along with Annemieke's [work]. (emphasis added)." In doing his work, DeMaggio worked primarily from home on computer equipment that he bought and paid to maintain. The Defendants never paid him anything for his work. They never provided him benefits. They never controlled how he did his work. And they never requested him to execute an assignment of his copyright interests. While the Defendants promised him Phantom Equity, they reneged on this promise when they canceled his interest in January of 2013. Based on these facts, DeMaggio can negate any claim that the Defendants own his copyright interests under the work for hire doctrine.

4.     **Annemieke Owns Her Copyrights.** Likewise, Annemieke owns the copyright interests in the Cancer Reference Guides because she created these original resources and maintained ownership pursuant to the express terms of her executive employment agreement (the **"Executive Agreement"**). By 2009, Jain and Levonyak told others that Dava Oncology's successful start was due in large part to the strong written work of Annemieke. They described her as the "secret sauce" behind the product. To keep her at Dava Oncology, Jain and Levonyak offered Annemieke the Executive Agreement in 2009, which was a term employment agreement that could keep her at Dava Oncology through 2015. As part of the deal, Jain agreed to provide

Annemieke with more Phantom Equity and, more importantly, with "**ownership** of strategic projects and resources, [emphasis added]" which included the most valuable "resource" created by Annemieke—the Cancer Reference Guides. Based on this express provision of "ownership," Annemieke can demonstrate that she owns the Cancer Reference Guides, negating any possible ownership claim by the Defendants for her copyrights under the work for hire doctrine. Moreover, Annemieke can also negate the work for hire doctrine for two other reasons: (1) the Defendants' material breach of the Executive Agreement negated the presumption of ownership for employers under the Copyright Act; and (2) the Defendants' decision to disavow Annemieke as an "employee" by transferring her employment to a third party to obtain a financial gain and/or tax benefit repudiates Dava Oncology's claim to categorize her as an "employee" under the Copyright Act.

5.     **Preliminary Injunction**. This Court should enjoin the Defendants from infringing on the copyrighted works registered by the Plaintiffs with the U.S. Copyright Office (collectively, the "Copyrighted Works"). To establish a preliminary injunction, the Plaintiffs can show a likelihood of success because they own their respective interests in the Copyrighted Works and can show that the Defendants are copying such works. The Plaintiffs can also demonstrate four reasons why there is a threat of an irreparable harm if an injunction is not put in place during the course of this lawsuit. First, because the Defendants have hired a publishing expert to transform the Cancer Reference Guides into a different publishing model, it will be difficult for the Plaintiffs to calculate any damages associated with any negative ramifications arising from this experts' work without the Plaintiffs' input. Second, if the Defendants are permitted to allow someone other than Annemieke to update and revise her Cancer Reference Guides, Annemieke's reputation could be

4

irreparably harmed if such work is done poorly. Third, if the Defendants distribute these resources at a significant discount, or for nothing, in an effort to sell other services or products, that debasement of the Cancer Reference Guides' value would be very difficult to calculate. Fourth, if the Defendants are permitted to display copies of Annemieke's Copyrighted Works to potential competitors in their effort to sell Dava Oncology, those disclosures will be difficult to calculate as part of a damage model. Finally, given the bad faith of the Defendants and the importance of protecting the intellectual property of scientific researchers, the Plaintiffs can show that the balance of equities in this case favors them.

III.    <u>PARTIES</u>

6.    **ANNEMIEKE DEMAGGIO**. The Plaintiff, Annemieke DeMaggio, is a resident of Texas who resides in Rockwall, Texas.

7.    **ANTHONY "TONY" DEMAGGIO**. The Plaintiff, Anthony "Tony" DeMaggio, is a resident of Texas who resides in Rockwall, Texas.

8.    **DAVA ONCOLOGY, L.P.** The Defendant, Dava Oncology, L.P., is a Texas Limited Partnership with a principal place of business at 12222 Merit Drive, Dallas, Texas.

9.    **VINAY JAIN.** The Defendant, Vinay Jain, is a resident of Texas who resides at the following address: 10710 Inwood Road, Dallas, Texas.

10.    **MARK LEVONYAK.** The Defendant, Mark Levonyak, is a resident of Texas who resides at the following address: 6405 Bandera Drive, Dallas, Texas.

IV.    <u>JURISDICTION AND VENUE</u>

11.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because, *inter alia*, this lawsuit includes claims arising under 17 U.S.C. §§ 101 et seq. This

Court has personal jurisdiction over the individual Defendants because each of them resides in Texas and Defendant Dava Oncology because it is a Texas Limited Partnership with a principal place of business located in Dallas, Texas. Venue is appropriate in this matter because the principal place of business for the Defendant, Dava Oncology, is located in Dallas, Texas.

## V.   FACTUAL BACKGROUND

12.   **Annemieke: Scientific Medical Writer.** Annemieke DeMaggio is a scientist who earned her Ph.D in Molecular Genetics from the University of Utrecht in The Netherlands based on her research conducted at Yale University Medical School in New Haven, Connecticut. As such, she has worked professionally as a technical medical writer who specializes in cancer writing projects. Her strength as a technical medical writer lies in her ability to transform reams of data from various cancer clinical trials and other sources of information into a narrative form that explains complex topics in clear and concise terms. To do this, Annemieke utilizes illustrations, tables, diagrams, and direct prose to tell a story about what is happening in a particular segment of cancer research. It is this ability to tell a story about such complex data that sets Annemieke apart from others in her field and makes the Copyrighted Works so valuable.

13.   **DeMaggio: Scientist and Technological Expert.** Anthony "Tony" DeMaggio, who has a Bachelor of Science in Molecular Biology, has worked extensively in the cancer research industry. He originally worked as a scientist at the Salk Institute in San Diego and then moved to Seattle to be part of ICOS, which was a small biotech firm founded by George Rathman (who had previously founded biotech giant Amgen). DeMaggio remained at ICOS for 14 years until the company was sold. While there, he helped discover new proteins (e.g. kinases), including a number of proteins known today as important targets for cancer therapy. His work on this protein research

has been published in peer-reviewed journals and has contributed to the clinical development of various cancer treatments. Based on this work, DeMaggio is a co-inventor on nine U.S. and European patents, including patents for the methods associated with his computer-based algorithms. In addition to his expertise in cancer research, DeMaggio is also proficient at computer programming as a software developer with training and experience in writing computer code for programs designed to enhance the presentation of technical writing. During his tenure at ICOS, for instance, DeMaggio developed significant expertise in bioinformatics and programming, including proficiency in coding related to data mining, database design, and automated information retrieval.

14.     **Plaintiffs' Marriage**. On April 24, 1999, Annemieke and DeMaggio were married. They have three young children and reside in Rockwall, Texas.

15.     **Defendant Vinay Jain**. The Defendant, Vinay Jain received his M.D. from the All-India Institute of Medical Sciences in New Delhi, India in 1982. He was the founder of the Physicians Education Resource, L.P. and Cancer Information Group, L.P. Upon information and belief, in July of 2005, he sold these entities to Medical Media Holdings, LLC, receiving 100% of the proceeds from the sale. Upon information and belief, none of the parties who worked to develop and build his partnership interests in these entities received any distribution of the proceeds generated by the sale of these entities.

16.     **Annemieke's Consulting Firm**. In 2003, Annemieke started a consulting firm called *Science Communications* to provide consulting services for bio-tech companies that were working to develop and market cancer drugs. As the sole owner, Annemieke provided consulting

services that delineated sophisticated communication strategies based on her research and analysis of data from various clinical cancer trials and other sources.

17.     **DeMaggio's Contribution to Annemieke's Consulting Firm**. Annemieke's consulting firm utilized DeMaggio's technical expertise to enhance the "look and feel" of her various written work. For instance, DeMaggio worked with Annemieke to create web-portals for Annemieke's clients that allowed them to receive electronic updates of Annemieke's work as new data emerged from relevant clinical trials, as well as post and store information that was related to the clients' projects. These web-portals were a great resource for Annemieke's clients.

18.     **Success of Annemieke's Consulting Firm.** By 2006, Annemieke's consulting firm was a success, creating an array of communication strategies for a number of biotech firms that were attempting to develop specific cancer drugs. To illustrate, her gross income in the last full year of her consulting firm (2006) exceeded $225,000. While Annemieke's consulting firm was successful, she wanted to expand her work product beyond the creation of "communication strategies" for specific drugs. In particular, she wanted to create broader strategies and resources for drug development associated with specific cancer types and specific biological pathways that are applicable to multiple cancer types. By creating these drug development resources, Annemieke's consulting firm could have provided development strategies for biotech firms with an array of cancer drug.

19.     **Annemieke's Work with Levonyak before Dava**. While working for her consulting firm, Annemieke provided services to Levonyak's company, AnorMed. At that time, Levonyak was AnorMed's Vice President of Commercial Operations. He worked closely with Annemieke as she developed a communication strategy for AnorMed's primary cancer drug. To assist Annemieke in

her work with Levonyak, DeMaggio created a web-portal for AnorMed, which was well received by Levonyak. Utilizing Annemieke's excellent work product, AnorMed was successful in selling its cancer drug to a larger biotech company. Levonyak was very impressed with Annemieke's work. Indeed, after AnorMed was sold, the buyer of AnorMed assumed Annemieke's consulting engagement originally executed with AnorMed. This meant that the sale of AnorMed would not negatively affect Annemieke's revenue stream from her work associated with the buyer's continued development of AnorMed's cancer drug.

20.     **Levonyak's Partnership Pitch to Form a New Company with Jain**. After the sale of AnorMed, Levonyak approached Annemieke in 2007 to persuade her to join him and Jain as a founder in a new biotech company. At the time, Levonyak convinced Annemieke that she should leverage her exceptional writing skills to join a new company with Jain because Jain was a proven success who made a significant return when he sold two of his entities in 2005. To demonstrate Jain's success, Levonyak discussed Jain's experience selling his former partnerships for upwards of $500 million. According to Levonyak, while Jain had not paid any of that money to the key people who developed and built those partnerships, he was now willing to provide the founders of this new partnership with a "piece of the upside" that could be cashed out when the company was sold. Levonyak told Annemieke that Jain was willing to make 10% of the company's equity available to founders like Annemieke. Using Jain's prior experience to illustrate the potential upside of this new entity, Levonyak told Annemieke that he thought that the potential upside of this 10% interest could reach as high as $50 million in four to six years.

21.     **Defendants' Promise of Equity**. After her initial meeting with Levonyak, Annemieke agreed to join the new partnership with Jain on the condition that they agreed to

provide her with an equity interest in the company. To that end, Levonyak promised Annemieke that she would receive an equity stake in Dava Oncology in the form of Phantom Equity, which would be cashed out when Dava Oncology was sold. Neither Jain nor Levonyak ever explained or disclosed to Annemieke or DeMaggio that such Phantom Equity could be canceled "at will" by any of the Defendants. If Annemieke was told that her Phantom Equity could be canceled "at will" by the Defendants, she never would have joined Dava as a founder or agree to accept Phantom Equity as part of her compensation package.

22.     **Significant Cut in Salary**. In addition to an equity interest in Dava Oncology, Annemieke also requested that she be paid a salary once she joined the company. While Levonyak agreed to pay her a salary, he told her that she could not earn a salary comparable to her income level from 2006 because she would be working as a "founder" in a start-up company. Annemieke agreed to accept a pay cut that was almost a 50% cut from her gross income level in 2006. In doing so, Annemieke decided that an equity interest in Dava Oncology was worth the risk of foregoing her higher income level from her consulting firm in Seattle.

23.     **Annemieke's Family Moves to Texas**. To join Dava Oncology as a founder, Annemieke also had to relocate her family to Dallas, Texas, because that is where Jain had established his other business interests. While this relocation was a significant burden on Annemieke's family, she and her husband agreed to move because the upside associated with Dava Oncology was worth the risk. For DeMaggio, whose primary business contracts within the cancer research industry were located in the State of Washington, the move to Texas limited his ability to find work to further his career. With this move, therefore, Annemieke and DeMaggio had put all of their eggs in the Dava Oncology basket, relying on the promises by Levonyak and Jain that it

would all pay off when Dava Oncology was sold. Given that Levonyak had indicated that the potential payoff could be a multi-million dollar return, Annemieke and DeMaggio took the plunge and moved their family to Texas. Annemieke started working for Dava Oncology in March of 2007.

24. **No Assignment of Science Communications' Intellectual Property**. When Annemieke joined Dava as a founder in March of 2007, she was never asked to execute, nor did she ever execute, any documentation that would assign to Dava Oncology, in any manner whatsoever, any of her intellectual property created before she joined Dava, including any such intellectual property created for her consulting firm.

25. **Dava's Business Model**. In the spring of 2007, Annemieke and Levonyak worked closely to develop and implement a business plan for Dava Oncology that would focus on establishing a strategic consulting firm.

26. **Defendants' Praise of Annemieke's Work**. In the first two years of Dava, Annemieke provided an array of consulting services for bio-tech companies that were akin to her work done in Seattle for her own consulting firm. Building on her prior consulting work, Annemieke developed sophisticated drug development strategies for an array of biotech companies. And the Defendants, Jain and Levonyak, often praised Annemieke for her great work. In one email, for instance, Levonyak spoke of Annemieke's work effusively: "WOW. This presentation is incredible...impressive.....I love the design and flow....Way to go [Annemieke]." In fact, Jain and Levonyak often referred to Annemieke's work as the "secret sauce" behind Dava Oncology's success.

27.     **Dava's Promises of More Phantom Equity**. In light of Annemieke's great work, the Defendants often rewarded her with additional shares of Phantom Equity. Throughout her time at Dava Oncology, the Defendants made multiple statements to Annemieke that her work would pay off when she cashed out her Phantom Equity at the time Dava was sold. The only caveat made by the Defendants concerning the Phantom Equity was their contention that Annemieke could lose her "unvested" shares of Phantom Equity or subject her "vested" shares to being bought back by Dava if she voluntarily left Dava Oncology. The Defendants had explained this qualification as an incentive to keep key people like Annemieke at Dava Oncology. They never told her that the Phantom Equity could be canceled "at will" if she was terminated. Indeed, in July of 2010, Levonyak explained this "caveat" with the following statement: "If you [Annemieke] leave employment, all unvested incentive units are canceled. Vested units can be bought back by the company if employees leaves [sic] Dava." Based on the statements made by the Defendants, Annemieke assumed that her Phantom Equity could not be negatively affected unless she voluntarily left Dava Oncology and that her vested shares could never be canceled.

28.     **Annemieke's Term Executive Agreement**. After Annemieke's successful start with Dava Oncology, the Defendants offered her a term executive agreement to keep her at Dava Oncology for up to six years. This executive agreement was signed by Jain and Annemieke in September of 2009 (the "**Executive Agreement**"). (*See* Executive Agreement, attached hereto as **Exhibit 1**.) Under the terms of this Executive Agreement, the initial term was for one year with an automatic renewal provision for five additional one-year terms. The Executive Agreement automatically renewed each year for another one-year term unless the agreement was terminated before the new term started. For Annemieke, it was her understanding that once the Executive

Agreement was renewed for another one-year term, she was entitled to her full base salary for that year. Indeed, in subsequent years, Levonyak defined Annemieke's "base salary" in terms of her full annual salary. For instance, when he notified Annemieke in 2010 about her raise, Levonyak wrote the following: "As an acknowledgement of your hard work and dedication to the success of Dava Oncology, we are pleased to give you a salary increase of $20K, effective July 19, 2010, which brings your base salary to $170K/year."

29.     **Annemieke's "Ownership" of Strategic Projects and Resources.** As part of the Executive Agreement, the Defendants offered Annemieke "ownership" of the "strategic projects" and "resources" that she worked on. As a founder in Dava Oncology, Annemieke wanted ownership of her own written work and thus obtained the agreement of the Defendants that she would retain ownership in such work. To that end, Annemieke and Jain executed the Executive Agreement that incorporated the attachment labeled *Schedule C* which made this point of ownership clear: Annemieke "takes **ownership** of strategic projects and resources, develops creative insights and solutions, and provides the vision of what the final deliverables need to be." (Executive Agreement, **Exhibit 1**) (emphasis added) This text in the Executive Agreement concerning ownership was prepared by Dava and accepted by Annemieke as sufficient to demonstrate her ownership in the "strategic projects and resources," which included, *inter alia*, the Cancer Reference Guides that Annemieke created after she executed the Executive Agreement.

30.     **Annemieke's Creation of the Cancer Reference Guides.** By 2010, Annemieke was working to create a series of research resources for various cancer types and biological pathways. These resources exemplified Annemieke's vision for building deep, broad-based resources to facilitate drug development strategies for all types of biotech companies, ranging from the small

one-drug companies to the large multi-drug biotech firms. At first, Annemieke created what was referred to as "Standard of Care" reference guides. These reference guides sought to provide in-depth analysis of cancer research data from an array of sources, including, but not limited to, the following sources: cancer clinical trials held throughout the world, private data from various biotech firms, and data from public databases. Annemieke also researched the current literature related to particular types of cancer or specific biological pathways. While these "Standard of Care" resources aimed to delineate the current state of the data associated with a particular cancer type (or a specific biological pathway), they did not project the data forward to show where drug development was potentially going. To do this, Annemieke developed a model that projected the likely trend of existing clinical trials. Using these forward projections, Annemieke transformed the Cancer Reference Guides into an exciting new resource for oncologists and biotech firms to utilize to make critical strategic decisions about drug development strategies. These forward-looking versions of the Cancer Reference Guides were branded as either a *Compass* for specific cancer types (e.g. *The Breast Cancer Compass*) or a *Navigator* for specific biological pathways (e.g. the *MET Navigator*). DeMaggio worked to create the computer programming to transform these resources into an electronic version.

31.     **DeMaggio's Computer Works (Cancer Reference Guides)**. Between 2008 and 2013, DeMaggio developed various computer programs to enhance Annemieke's work on the Cancer Reference Guides. Specifically, DeMaggio transformed Annemieke's written work on the Cancer Reference Guides into an electronic "clickable" version that could be displayed or transported electronically to Dava's clients (the "Clickable Version"). DeMaggio's Clickable Version allowed a reader to move from one part of the resource to another with a simple click of

the mouse. After DeMaggio made the Clickable Versions, he began working to make the Cancer Reference Guides functional on portable tablets like the iPad (the "Tablet Version"). To do this, the Cancer Reference Guides had to be transformed into a non-linear mode that was more than just clickable. To utilize these Tablet Versions, DeMaggio also developed a specialized tablet application (or "App") that allowed the Cancer Reference Guides to be downloaded for use on an iPad. DeMaggio's computer programming on the Cancer Reference Guides greatly enhanced the "look and feel" of these resources, which greatly improved the marketability and value of these resources.

32.     **DeMaggio's Computer Works (Websites).** Besides his work with Annemieke on the Cancer Reference Guides, DeMaggio provided a significant amount of technical work for Dava Oncology and other entities owned by Jain. In 2008, for instance, DeMaggio suggested to Annemieke that he create client web-portals similar to the web-portals he had created for Annemieke's clients with her Seattle consulting firm. When Annemieke revealed this suggestion to Levonyak for consideration, he agreed that it was a good idea based, in part, on the web-portal work that DeMaggio had done for Levonyak's prior company, AnorMed. DeMaggio also created a website called the *Dava Community*. This website was designed as a research consortium to facilitate interaction among oncologists and cancer researchers in an effort to improve cancer treatment. In 2012, DeMaggio developed and created the "look and feel" of the website associated with Annemieke's work implementing the ONE Oncology business plan.

33.     **DeMaggio's "Wow Factor."** Both Jain and Levonyak were very impressed with DeMaggio's technical work and his ability to leverage technology to improve communication. To illustrate, when Dava had an important opportunity to land a new client, Levonyak wanted

DeMaggio working on the project because he could create the "wow factor" necessary to impress the client: "This needs to be a wow presentation so that we can sell these books...similar to what we have done for [another large biotech client]. This is a million dollar project so it has to look like one. I would like to show it in hard copy but also on the iPad. *Tony [DeMaggio] I have you copied as well because you can put the wow factor into the equation* along with Annemieke's alignment of the pipeline. Let's plan on having this completed by this Friday and then it will become the template on how we sell these projects to future clients" (emphasis added). As this email message demonstrates, Dava utilized DeMaggio's computer work to create the "look and feel" necessary for its million dollar projects with the intention of using his work as a template going forward.

34.    **DeMaggio's Work on the DOW**. In 2008, DeMaggio developed computer software necessary to create a comprehensive database for oncologists called the *Dava Oncology World* (the "DOW"). This database was established to gather and organize an array of varied information about oncologists. While Dava Oncology had some of this information to start the database, they failed to utilize this information because they did not have the technical expertise to extract such information into a manageable format. Dava Oncology also did not have the technical expertise to gather additional information necessary to complete and update the database. DeMaggio provided the expertise to resolve both obstacles. To do this, he wrote the computer code that permitted Dava Oncology to extract and load oncologist information from large, national databases into a format that Dava could manipulate to create its own personalized database. After extracting this initial information, DeMaggio then developed the programming necessary for "automated information retrieval" from various online databases to complete and update the information

necessary to establish the DOW. In completing this work, DeMaggio spent months gathering the information and utilized his own equipment and resources.

35. **DeMaggio's Status with Dava.** DeMaggio was a consultant for Dava Oncology. DeMaggio was **not** an employee of Dava. He was never paid any money for his work. He was never provided any benefits from Dava. He was never issued a W-2. He worked primarily from his home, traveling to Dava's office intermittently. He bought and utilized his own computer equipment to work on his projects, which included the use of his own computer, his own software programs, and his own servers. DeMaggio even installed one of his personal servers in Dava's office to facilitate his work. For his work, the Defendants promised to compensate him with shares of Phantom Equity. Similar to the false promises made to Annemieke, Levonyak and Jain often told DeMaggio that all of his hard work would pay off for him and his family when the company was sold and his Phantom Equity was cashed out. But this was a misrepresentation: the Defendants never intended to convey any of the Phantom Equity to DeMaggio and, in fact, canceled DeMaggio's Phantom Equity in January of 2013.

36. **DeMaggio's Work for Jain's Other Entities**. DeMaggio also provided work product for an array of other entities owned by Jain, including OKM, LLC, Arog Pharmaceuticals, LLC, Mentrik Biotech, LLC, Trimer Boitech, LLC, Jiv Daya Foundation, and the Shraman South Asian Museum and Learning Center Foundation. DeMaggio was never paid anything for his work with these entities. Yet, Jain was unjustly enriched by DeMaggio's work. For instance, when Arog Pharmaceutical wanted to install a so-called "Alfresco" program to maintain certain information as confidential, DeMaggio told Jain that it would cost him something in the $30,000 to $40,000 range to do so if he hired a company to do it. Over the next few months, DeMaggio did the work

to install this system with the expectation that he would be compensated with additional shares of Phantom Equity.

37. **DeMaggio's Written Documents**. DeMaggio's relationship with Dava was reduced to writing on a couple of occasions. In each of these writings, Dava referred to DeMaggio as a "consultant" and delineated, in sparse terms, the "Goals & Objectives for Consulting Services." While the Defendants promised to compensate DeMaggio with shares of Phantom Equity, they reneged on this promise when they canceled his shares in January of 2013. More important, there was nothing in any of these written documents that could constitute an assignment of DeMaggio's copyright interests created during the last five years to any of the Defendants.

38. **DeMaggio Owns Intellectual Property**. Given that DeMaggio was not an employee of Dava or an independent contractor subject to a written assignment of his copyright interests, DeMaggio owns all of the respective Copyrighted Works he authored during the past six years, including the non-literal elements of his computer work associated with the "look and feel" of the Cancer Reference Guides.

39. **Jain's Establishment of OKM to Compete with Dava**. While Annemieke was working on the Cancer Reference Guides, Jain established a new entity that would compete directly with Annemieke's work at Dava Oncology by forming OKM LLC with two other founders: Stefanie Daniels and Kraig Steubing. This business was established to develop strategic services that would compete directly with the consulting services being developed by Annemieke. In an effort to build up OKM, Jain shared proprietary and confidential information with OKM's founders and employees. Indeed, OKM was given complete access to all of Dava's information though Dava's so-called "P-Drive," the drive that maintained all of Dava's shared company

information, including the information that was ostensibly considered confidential and proprietary. Annemieke viewed OKM as a direct threat to her work.

40.     **Defendants' Intent to Sell Dava.** Upon information and belief, the Defendants began the process of selling Dava Oncology in 2012 and have continued to seek potential buyers for Dava Oncology's various assets. Upon information and belief, the Defendants intend to include the Plaintiffs' Copyrighted Works in any potential sale.

41.     **Annemieke's Workload for the Second Half of 2012.** Annemieke worked feverishly in the second half of 2012 on two important strategic projects for Dava Oncology: (1) the ONE Oncology project; and (2) the completion of various Tablet Versions of the Cancer Reference Guides. For the ONE Oncology project, Annemieke presented a detailed plan to host a series of expert forums where oncologists and other cancer research experts could present their findings and research on various cancer types or biological pathways. At these forums, the experts would speak to representatives of biotech firms working on drug development related to the forum's topic. By hosting these forums, Annemieke believed that Dava Oncology could market the content of the forum itself by selling video copies of the speaker's presentation. These video copies were called "virtual meetings". DeMaggio utilized his technical expertise to create these virtual meetings. In addition to selling the virtual meetings, Annemieke also thought that Dava Oncology could market the Cancer Reference Guides associated with the forum's topic. To implement this project, Annemieke hosted two expert forums before the end of 2012. The first was held at the end of October and the second was at the end of December. Both of these forums were a great commercial success, generating approximately $700,000 in revenue for Dava Oncology.

42.     **Annemieke's Creation of Cancer Reference Guides in 2012.** At the same time that Annemieke worked to create and implement the ONE Oncology project, she also worked tirelessly in the final months of 2012 to finish her work on a number of Tablet Versions of the Cancer Reference Guides. By the end of 2012, Annemieke had finished her work on the following resources: the Melanoma Compass, the Myeloma Compass, the Diffuse Large B-Cell Lymphoma Compass, the B-Cell Lymphoma Compass, the Breast Cancer Compass, the Breast Cancer Her-2 Compass, the Lung Cancer Compass, the CLL Compass, the RCC Compass, and the MET Navigator.

43.     **Defendants Engage Publishing Specialist to Market Cancer Reference Guides**. As Annemieke and DeMaggio were finishing their work on an array of Cancer Reference Guides in December of 2012, the Defendants hired a publishing expert named Martijn Tel to consider transforming Annemieke's Cancer Reference Guides into a subscription series or some other profitable publication model. At this point, the Defendants decided that Annemieke and DeMaggio were expendable and thus no longer necessary for the development of Dava Oncology. Moreover, upon information and belief, the Defendants concluded that they would acquire more profits from the pending sale of Dava Oncology if Annemieke was terminated and the block of Phantom Equity held by the Plaintiffs was canceled.

44.     **Wrongful Termination of Annemieke**. After Annemieke worked tirelessly in the last months of 2012 to complete these two projects, in addition to her other executive duties, the Defendants wrongfully terminate Annemieke and canceled her Phantom Equity. On January 7, 2013, Levonyak castigated Annemieke during a company meeting about her work conducted during the end of 2012. After she challenged his analysis during the meeting, he told her to leave

the office and to submit her resignation. Following the meeting, Levonyak again requested that Annemieke submit her resignation. She refused. Annemieke was resolved not to resign her position because Levonyak was wrong. On the next day, Jain told Annemieke that she should stay out of the office until the matter sorted itself out. At this point, Annemieke was not aware that the Defendants had already conspired to terminate her and cancel her Phantom Equity. Indeed, just three days after this meeting, Dava had already posted a job description for a managerial position to replace Annemieke.

45.     **Dava's Removal of DeMaggio**. On or about January 10, 2013, DeMaggio traveled to Dava's Dallas office to meet with various people concerning his work. Shortly after his arrival, he was removed from the office and was given the impression by Levonyak and others that he was not allowed to return to Dava Oncology. Around this same time, Levonyak and others notified DeMaggio that he should cease his work on various projects and return his work to them "as is."

46.     **Dava Canceled Plaintiffs' Phantom Equity**. On January 14, 2013, Michael Ball, an agent for the Defendants, presented Annemieke with a proposed severance package that would voluntarily terminate Annemieke's employment with Dava Oncology. According to Ball, it was the Defendants' position that Annemieke was not entitled to any further salary payments, or to any interest in her Phantom Equity, once Dava terminated her with a written notice of termination. To be clear, Ball told Annemieke in unequivocal terms that, unless she agreed to the proposed terms of Dava's severance package, Annemieke and DeMaggio would "get nothing" once the Defendants issued a termination letter to Annemieke. Her salary payments would be cut off and their Phantom Equity canceled. On January 23, 2013, Ball presented Annemieke with a more formalized draft of their proposed severance package. At this point, Ball also presented Annemieke

with the terms of a severance agreement between Dava Oncology and DeMaggio. He told Annemieke that she and DeMaggio had until Friday, January 25, 2013 to accept Dava Oncology' terms. If they failed to accept the terms by this deadline, Ball instructed Annemieke that Dava Oncology would issue her a termination notice and rescind the two proposals. According to Ball, once the termination notice was issued, Annemieke and DeMaggio would "get nothing" going forward.

47.     **The Termination Notice**. On Friday, January 25, 2013, the deadline imposed by the Defendants, Annemieke and DeMaggio had requested more time from Dava Oncology to consider their proposals because they did not have sufficient time to review the pending proposals with legal counsel. Ball rejected this request and sent Annemieke a termination letter on the afternoon of January 25, 2013. With this termination notice, the Defendants wrongfully terminated Annemieke's Executive Agreement and wrongfully canceled the Phantom Equity owned by her and her husband, DeMaggio.

48.     **Fraudulent Promise of Phantom Equity**. Annemieke was never informed that her equity interest could be terminated "at will" by the Defendants. If Annemieke was told that her equity interest could be canceled "at will" by the Defendants, she never would have agreed to move her family to Texas to join Dava Oncology or to execute the Executive Agreement.

49.     **Interference with DeMaggio's Property**. Upon information and belief, the Defendants intend to interfere with the computer and online property owned by DeMaggio. In particular, the Defendants intend to interfere with the computer server owned by DeMaggio and located within Dava Oncology's office. The Defendants also intend to interfere with DeMaggio's ownership of three domains: sciencecommunication.net, scicomhq.com, scicomhq.net. Finally, the

Plaintiffs believe that the Defendants are attempting to interfere with the following IP addresses owned by the Plaintiffs, as well as the respective servers connected with these IP addresses: IP Address 65.39.222.50, IP Address 65.39.222.51, IP Address 65.39.222.53, IP Address 65.39.222.54, IP Address 65.39.223.70, IP Address 65.39.223.71, IP Address 65.39.223.72, and IP Address 65.39.223.73.

50.    **Data Disclaims Annemieke as an Employee**. In preparing this lawsuit, the Plaintiffs discovered that Dava Oncology had disavowed Annemieke as an "employee" of Dava Oncology by assigning her employment contract to an entity called ADP Total Source Company (**"ADP"**). In fact, ADP issued Annemieke her pay checks and was listed as Annemieke's "employer" on her W-2 filed with the IRS. By disavowing Annemieke as an "employee" of Dava Oncology, the Plaintiffs believe that the Defendant, Dava Oncology, sought to avoid the responsibility associated with being an employer of Annemieke for some financial gain or some tax benefit. By disavowing Annemieke's employment with Dava Oncology, the Defendants have forfeited any claim that she is an "employee" for the purposes of the work for hire doctrine.

51.    **Copyright Registrations Filed with U.S. Copyright Office**. On or about February 14, 2013, the Plaintiffs filed a series of copyright registrations that are listed below under the heading "Copyrighted Works Registered by the Plaintiffs with the U.S. Copyright Office." These Copyright filings are referred to herein as the "**Copyrighted Works**." (*See* Registration Notices, attached hereto collectively as <u>**Exhibit 2**</u>.) These forty-three filings are divided into six general categories. The first category includes the Cancer Reference Guides that were created by Annemieke in 2010 in paper form. The second category includes Cancer Reference Guides created by Annemieke and transformed by DeMaggio into an electronic Clickable Version. The

third category includes Cancer Reference Guides created by Annemieke and transformed by DeMaggio into can electronic Tablet Version. The fourth category includes the computer work authored by DeMaggio concerning the creation of three different Tablet applications. The fifth category includes the computer work authored by DeMaggio for two websites. And the sixth category includes a series of videos created by DeMaggio.

## "COPYRIGHTED WORKS"
### REGISTERED BY THE PLAINTIFFS WITH THE U.S. COPYRIGHT OFFICE

### Cancer Reference Guides (Paper Versions)

*(1)*  **Indolent Non-Hodgkin's Lymphoma**: *A Reference Guide to Important Clinical Trials* (2010) (Paper Version) (Author is Annemieke)

*(2)*  **Prostate Cancer**: *A Reference Guide to Important Clinical Trials* (2010) (Paper Version) (Author is Annemieke)

*(3)*  **Hodgkin's Disease** *A Reference Guide to Important Clinical Trials* (2010) (Paper Version) (Author is Annemieke)

*(4)*  **Diffuse Large B-Cell Lymphoma** *A Reference Guide to Important Clinical Trials* (2010) (Paper Version) (Author is Annemieke)

*(5)*  **Colorectal Cancer** *A Reference Guide to Important Clinical Trials* (2010) (Paper Version) (Author is Annemieke)

*(6)*  **Breast Cancer ~ Her-2 Positive** *A Reference Guide to Important Clinical Trials* (2010) (Paper Version) (Author is Annemieke)

### Cancer Reference Guides (Clickable Versions)

*(7)*  **Breast Cancer** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(8)*  **Breast Cancer Her-2 Negative & Triple** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(9)*  **Indolent Non-Hodgkin Lymphoma** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(10)*  **Hodgkin's Disease** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(11)* **Prostate Cancer** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(12)* **Breast Cancer - Adjuvant** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(13)* **Breast Cancer Her-2 Positive** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(14)* **Diffuse Large B-Cell Lymphoma** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(15)* **Less Common Lymphoma (T-Cell and Mantle Cell Lymphomas)** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

*(16)* **Ovarian Cancer** *A Reference Guide to Important Clinical Trials* (2010) (Clickable Version) (Authors are Annemieke and DeMaggio)

### Cancer Reference Guides (Tablet Versions—iPads)

*(17)* **MET Navigator** *A Reference Guide to Important Clinical Trials* (2011) (Navigator) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(18)* **Melanoma Compass** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(19)* **Myeloma Compass** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(20)* **Diffuse Large B-Cell Lymphoma** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(21)* **B-Cell Lymphoma** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(22)* **Breast Compass** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(23)* **Breast Compass Her-2** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(24)* **Lung Compass** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(25)*   **CLL (Chronic Lymphocyte Leukemia) Compass** *A Reference Guide to Important Clinical Trials* (2011) (Compass) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(26)*   **RCC (Kidney) Compass** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Compass) (Authors are Annemieke and DeMaggio)

*(27)*   **Acute Myeloid Leukemia (AML)** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Standard of Care) (Authors are Annemieke and DeMaggio)

*(28)*   **Gastric Cancer** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(29)*   **Breast Cancer - Her-2 Positive** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(30)*   **Breast Cancer - Her-2 Negative** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(31)*   **Non-Small Cell Lung Cancer** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Authors are Annemieke and DeMaggio)

*(32)*   **Ovarian Cancer** *A Reference Guide to Important Clinical Trials* (2011) (Tablet Version) (Authors are Annemieke and DeMaggio)

## Tablet Applications

*(33)*   **iPad Application** *(App) re Oncology Doctor Finder* (Author is DeMaggio)

*(34)*   **iPad Application** *(App) re Oncology Dialogue* (Author is DeMaggio)

*(35)*   **iPad Application** *(App) re Oncology Reference Guides* (Author is DeMaggio)

## Websites

*(36)*   Dava Community Website (Author is DeMaggio)

*(37)*   ONE Oncology Website (Author is DeMaggio)

## Videos

*(38)*   Expert Forum re Met - Virtual Meeting (Author is DeMaggio)

**(39)**   Renal Cell Carcinoma Training Video (Author is DeMaggio)

**(40)**   Lung Cancer Compass Training Video (Author is DeMaggio)

**(41)**   Reference Guide Presentation (Author is DeMaggio)

**(42)**   Breast Cancer Training Video (Author is DeMaggio)

**(43)**   Standard of Care Training Video (Author is DeMaggio)

## VI.     APPLICATION FOR PRELIMINARY INJUNCTION

52. **Preliminary Injunction—Enjoin Infringement of Copyrighted Works**. The Plaintiffs, Annemieke and DeMaggio, hereby apply for a preliminary injunction against the Defendants to enjoin the Defendants, during the course of this lawsuit, from infringing on the Plaintiffs respective Copyrighted Works delineated above in paragraph 51. More specific, this Court should enjoin the Defendants from copying, manufacturing, selling, distributing, creating derivative works from, posting on web-portals, or downloading onto electronic tablets like the iPad any of the Copyrighted Works listed above in paragraph 51.

53. **Legal Standard for Preliminary Injunction**. Pursuant to 17 U.S.C. § 502, this Court should enjoin the Defendants from copying, manufacturing, selling, distributing, creating derivative works from, posting on a web-portal, or downloading on an electronic tablet (e.g. iPad) any of the Plaintiffs' Copyrighted Works. 17 U.S.C. § 502; *see also Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 531 (5th Cir. 1994) (court issued preliminary injunction to enjoin defendant from "manufacturing, distributing, or selling" the plaintiffs' copyright). "The purpose of a preliminary injunction is to preserve the status quo pending a determination of the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In Texas federal courts, "[t]o obtain a preliminary injunction, the moving party must establish four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable harm; (3) the threatened injury out-weighs any damage that the injunction may cause opposing party; and (4) the injunction will not disserve the public interest." *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991). Here, because the Plaintiffs can establish each such element, this Court should grant their application for a preliminary injunction.

54.     **Likelihood of Success**. The Plaintiffs can demonstrate a likelihood of success on its copyright infringement claims because they can establish that they are the owners of their respective Copyrighted Works and because they can establish "copying" by the Defendants. To establish a copyright infringement claim, the Plaintiffs must "show 'ownership' of the material and 'copying' by the defendant. To establish 'ownership,' the plaintiff must prove that the material is original, that it can be copyrighted, and that he has complied with statutory formalities. To establish 'copying,' the plaintiff generally must show that the defendant had access to the material and that there is a substantial similarity between the two works." *Lakedreams v. Taylor*, 932 F.2d 1103, 1107-08 (5th Cir. 1991).

55.     **Plaintiffs Own Copyrighted Works**. The Plaintiffs can demonstrate that they are the owners of their respective Copyrighted Works. "The purpose of the copyright law is to promote and protect creativity. For a work to qualify for copyright protection, it must be original. And originality, as the term is used in copyright, requires both 'independent creation' and 'a modicum of creativity.' The requisite level of creativity is extremely low." *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 787 (5th Cir. 1999). Here, because the Plaintiffs can satisfy this threshold issue of originality and can demonstrate that the "work for hire" doctrine does not apply, they can demonstrate that they own their respective Copyrighted Works.

56.     **Annemieke Owns Cancer Reference Guides**. For Annemieke, she can demonstrate that she is the owner of the various Cancer Reference Guides that she authored because these cancer resources constitute her original analysis and expression about each resource topic created. She was the person who analyzed the research data from various clinical trials and other sources; she was the person who created the illustrations, tables, and diagrams; and she was

the person who drafted the text. Other than the computer work done by DeMaggio on some of the Cancer Reference Guides, the only assistance that Annemieke received was perfunctory assistance from her staff, which does not affect her ownership interest. *See, e.g., Lakedreams v. Taylor*, 932 F.2d 1103, 1107-08 (5th Cir. 1991) (court rejected defendant's claim of authorship because plaintiff "developed the [Copyrighted Works'] design and text, with only perfunctory assistance from [the defendant].").

57. **Work for Hire Not Applicable to Annemieke**. Annemieke can demonstrate that the "work for hire" doctrine does not negate her ownership interest in her Copyrighted Works because she executed the Executive Agreement that expressly provided her with the "ownership of strategic projects and resources," which included research resources like the Cancer Reference Guides. Under the Copyright Act, the work for hire doctrine does not apply when "the parties have expressly agreed otherwise in a written instrument signed by them." 17 U.S.C. § 201(b). Here, because the Defendant, Jain, agreed in writing that Annemieke could maintain ownership of the strategic projects and resources like the Cancer Reference Guides, Annemieke can demonstrate that the work for hire doctrine does not apply to the Cancer Reference Guides and, as a result, that she will likely succeed at trial on this issue of ownership.

58. **Additional Reasons that Negate Work for Hire**. Moreover, Annemieke can establish two other reasons why the work for hire doctrine does not apply to her Copyrighted Works. First, because the Defendants materially breached the Executive Agreement by, *inter alia*, canceling all of her Phantom Equity, Annemieke can establish a legal basis under a recession theory that rescinds the Executive Agreement to negate the Defendants' basis for claiming ownership under the work for hire doctrine. Second, while Annemieke executed an Executive

Agreement with Dava Oncology, the Defendants transferred her employment relationship to another entity called ADP Total Source Company, which meant that Annemieke was not actually employed by Dava Oncology. Indeed, ADP signed her employment checks and issued her the W-2 form for her taxes. On the W-2 form, Annemieke's employer was listed as ADP Total Source Company; it was not the Defendant, Dava Oncology. These two points further support Annemieke's claim that she will likely succeed at trial in showing that she owns her Copyrighted Works.

59.   **DeMaggio Owns Electronic Cancer Reference Guides**. DeMaggio can establish that he is the owner of the respective Copyrighted Works associated with his computer projects, website development, and videos because he was the author of those works. For the Cancer Reference Guides, DeMaggio created the two electronic versions of these resources: the Clickable Version and the Tablet Version. The Clickable Version allowed a person to electronically move throughout the document with a "click" of the mouse. The Tablet Version allowed a person to electronically move throughout the document using a tablet like the iPad. While the Clickable Version remained a linear document in its presentation, the Tablet Version had a different "look and feel" because it was a non-linear instrument.

60.   **DeMaggio Owns Tablet Apps**. DeMaggio owns the copyright interest, including the non-literal elements of his computer program, in the three tablet applications that he filed with the Copyright Office: (1) iPad Application re Oncology Doctor Finder; (2) iPad Application re Oncology Dialogue; and (3) iPad Application re Oncology Reference Guides. He created these applications with only perfunctory assistance from others. While he used some computer code in the public domain, he is not seeking copyright protection for those elements. He is only asserting

copyright protection over his original work necessary to create the "look and feel" of these three Tablet Applications.

61.     **DeMaggio Owns Websites**. DeMaggio owns the copyright interest, including the non-literal elements of his computer program, associated with his work to create two websites: (1) the Dava Community Website, and (2) the ONE Oncology Website.

62.     **DeMaggio Owns Videos**: DeMaggio owns the copyright interest in the six videos he filed with the Copyright Office.

63.     **Work for Hire Not Applicable to DeMaggio**. DeMaggio can demonstrate that the work for hire doctrine does not affect his ownership interest in his Copyrighted Works because there is no basis to establish DeMaggio as an employee of Dava Oncology. In general terms, the work for hire doctrine holds that, unless otherwise expressly agreed upon in writing, an employer will own the copyright to works created by its employees within the course and scope of their employment. Here, DeMaggio can demonstrate that he was not an employee of Dava Oncology. He was never paid by the Defendants. He was never provided any benefits from the Defendants. He worked primarily from home on his own equipment, including his own computer, his own software programs, and his own servers. He also paid the expenses associated with his work, including the expense paid to a "hosting company" to host various IP addresses and their respective servers. He even installed one of his personal servers in Dava Oncology's Dallas Office. More important, his work was never subject to the control of the Defendants.

64.     **No Written Assignment**. DeMaggio can also demonstrate that the work for hire doctrine does not apply to him as an independent contractor because there was no written assignment of his work to any of the Defendants. Under the work for hire doctrine, an employer

will own the copyright of an independent contractor so long as the work falls within one of the specific categories delineated in the Copyright Act and there is a written instrument signed by the independent contractor that expressly assigns the copyrights interests in the work. Here, while DeMaggio executed multiple agreements with Dava Oncology to provide services as a "consultant" in exchange for Phantom Equity, there is nothing in any of these documents that operates as an assignment.

65.   **Irreparable Harm**. If the Defendants are permitted to infringe on the Plaintiffs' copyright interests in the Copyrighted Works, the Plaintiffs will suffer irreparable harm. In copyright actions, a plaintiff can establish an irreparable harm by showing, *inter alia*, that it will be difficult to calculate the economic damages associated with the Defendants' actions. *See, e.g., Lakedreams v. Taylor*, 932 F.2d 1103, 1107-08 (5th Cir. 1991) ("A delay in [the plaintiff's] ability to fully market the [copyrighted material] until after the litigation has been settled could substantially reduce the marketing potential of the [copyrights items]."). Here, the Plaintiffs can establish irreparable harm for at least four reasons. First, the Defendants have engaged with a publishing expert who intends to transform the Plaintiffs' Cancer Reference Guides into a different format in order to market the product as part of Dava's pending sale. Once the Defendants implement this transition, it would be impossible to calculate potential economic damages to the Plaintiffs' work if such strategy negatively changed the nature of these research resources. Second, if the Defendants are permitted to update and revise the Cancer Reference Guides without the input of Annemieke, those updates and revisions would likely deviate from Annemieke's analysis and, if poorly done, severely injure her reputation within the cancer research industry. By allowing someone else to create a derivative work from Annemieke's Copyrighted Works, her reputation would be at the

mercy of the Defendants. Third, if the Defendants are permitted to show copies of the Copyrights Works to potential buyers or permitted to undervalue the Plaintiffs' Copyrighted Works as part of the sale, the Plaintiffs would have a difficult time calculating damages associated with their infringing actions. Fourth, if the Defendants significantly undervalue the price of the Cancer Reference Guides or give copies away in an effort to promote their other services and entities, the value of the Cancer Reference Guides going forward will likely be destroyed and, more importantly, will be very difficult for the Plaintiffs to calculate.

66.     **Balance of Equities**. The Plaintiffs can show that the balance of equities favors them because the Defendants have acted in bad faith. In this case, Annemieke agreed to join Dava Oncology based on the repeated promise that she would be entitled to a "piece of the upside" once the company was sold. But that was just a lie. After Annemieke completed the Cancer Reference Guides to the point where a professional publisher could turn the guides into a subscription series, she was wrongfully terminated and her Phantom Equity canceled. And this wrongful termination occurred just as the Defendants sought to find a seller for the company.

67.     **Supported by Public Interest.** It is in the pubic interest that this Court preserves the integrity of the Plaintiffs' Copyrighted Works by enjoining the Defendants from infringing on those rights during the course of this lawsuit. "The purpose of the copyright law is to promote and protect creativity. *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 787 (5th Cir. 1999). Here, if the Defendants are permitted to trample on the Plaintiff's copyright interests, it will undermine the promotion and protection of creative work in cancer research. It will signal to other scientists that their work and dedication to critical research will not be protected when it matters most. The public will not benefit if the rights of scientists are not protected, which will

lead to less scientific research. Moreover, given that the Plaintiffs have a much more vested interest in promoting the Copyrighted Works at issue, the public interest would be better served by enjoining the Defendants from undermining the value of those works in an effort to sell Dava Oncology.

68.     **Second Injunction—Enjoin Infringement of Unregistered Copyrights of DOW**. This Court should also enjoin the Defendants from copying, manufacturing, selling, distributing, creating derivative works from, posting on a web-portal, or downloading on an electronic tablet like the iPad any copyright material within their possession that belongs to the Plaintiffs even though such copyright material has not been registered with the U.S. Copyright Office. In particular, this Court should enjoin the Defendants from copying, manufacturing, creating derivative works from DeMaggio's computer work associated with creating the *Dava Oncology World* database (i.e. the "DOW"). Because the Plaintiffs do not have all of their copyrighted works within their possession—because their termination prevented them from acquiring their property before they left—this Court should enjoin the Defendants from infringing on the Plaintiffs' copyrights within their possession even though such works were not registered with the Copyright Office. As with the first claim for a preliminary injunction, the Plaintiffs can establish the four elements delineated above which are necessary to establish a right to a preliminary injunction.

69.     **Third Injunction—Enjoin Interference with DeMaggio's Property.** This Court should enjoin the Defendants from interfering with the following domain names owned by the Plaintiffs, the following IP addresses owned by the Plaintiffs, and the various servers connected with the IP addresses owned by the Plaintiffs:

      A.    Domain: scicomhq.com
      B.    Domain: scicomhq.net

| | |
|---|---|
| C. | Domain: sciencecommunications.net |
| D. | IP Address: 65.39.222.54 |
| E. | IP Address: 65.39.223.71 |
| F. | IP Address: 65.39.222.50 |
| G. | IP Address: 65.39.223.72 |
| H. | IP Address: 65.39.223.70 |
| I. | IP Address: 65.39.223.73 |
| J. | IP Address: 65.39.222.50 |

70.    Upon information and belief, the Defendants have sought to interfere with these IP Addresses and the servers connected with IP Addresses. By doing so, Plaintiff DeMaggio is likely to suffer irreparable harm because the Defendants' actions are likely to delete or otherwise destroy information that is valuable to the Plaintiffs. Because it would be very difficult to calculate any damages associated with the Defendants' interference, this Court should grant Plaintiff DeMaggio's application for a preliminary injunction. Plaintiff DeMaggio can also demonstrate that the balance of equities favor him because Dava Oncology has sufficient resources to conduct its business without interfering with Plaintiff DeMaggio's property.

VII.    <u>CAUSES OF ACTION</u>

71.    For each of the following causes of action delineated below, the Plaintiffs hereby incorporate into this section by reference the allegations contained in the preceding paragraphs as support for such causes of action:

**COUNT ONE**
**COPYRIGHT INFRINGEMENT**
**(BY PLAINTIFFS ANNEMIEKE AND DEMAGGIO)**

72.    The Plaintiffs incorporate by reference herein all of the relevant allegations contained in the prior paragraphs into **Count One**.

73.    The Plaintiff, Annemieke, filed copyright registrations with the U.S. Copyright Office on or about February 14, 2013 for the registrations of the Copyrighted Works identified

above in paragraph 51 under the heading "Cancer Reference Guides (Paper Version). These were the Cancer Reference Guides that were prepared in paper form and sold in a binder. Annemieke is the author of such Copyrighted Works and is, thus, the owner of such Copyrighted Works. As the owner of these Copyrighted Works, the Plaintiff, Annemieke, owns the exclusive rights of these Copyrighted Works, which includes, without limitation, the following rights: (1) the exclusive right to reproduce the Copyrighted Works (which includes identical or substantially similar reproductions of the Copyrighted Works), (2) the exclusive right to prepare derivative works based on the Copyrighted Works, (3) the exclusive right to distribute copies of the Copyrighted Works by sale, gift, rental, or lending; and (4) the exclusive the right to perform the Copyrighted Works publicly (in the case of sound recordings or other audiovisual works).

74.     The Plaintiffs, Annemieke and DeMaggio, have filed copyright registrations with the U.S. Copyright Office on or about February 14, 2013 for the registrations of the Copyrighted Works identified above in paragraph 51 under the heading "Cancer Reference Guides (Clickable Versions). The Plaintiffs are the authors of such Copyrighted Works. These were the Cancer Reference Guides that Annemieke created and that DeMaggio transformed into a "Clickable Version" based on his computer programming work. These Copyrighted Works are listed above under the heading "Cancer Reference Guides (Clickable Versions)." As the owners, the Plaintiffs, Annemieke and DeMaggio, own the exclusive rights of these Copyrighted Works, which includes, without limitation, the following rights: (1) the exclusive right to reproduce the Copyrighted Works (which includes identical or substantially similar reproductions of the Copyrighted Works), (2) the exclusive right to prepare derivative works based on the Copyrighted Works, (3) the exclusive right to distribute copies of the Copyrighted Works by sale, gift, rental, or lending; and

(4) the exclusive the right to perform the Copyrighted Works publicly (in the case of sound recordings or other audiovisual works).

75.     The Plaintiffs, Annemieke and DeMaggio, have filed copyright registrations with the U.S. Copyright Office on or about February 14, 2013 for the registrations of the Copyrighted Works identified above in paragraph 51 under the heading "Cancer Reference Guides (Tablet Versions—iPad). The Plaintiffs are the authors of such Copyrighted Works. These were the Cancer Reference Guides that Plaintiff Annemieke created and that DeMaggio created the computer work necessary to create the Table Versions. As the owners, the Plaintiffs, Annemieke and DeMaggio, own the exclusive rights of these Copyrighted Works, which includes, without limitation, the following rights: (1) the exclusive right to reproduce the Copyrighted Works (which includes identical or substantially similar reproductions of the Copyrighted Works), (2) the exclusive right to prepare derivative works based on the Copyrighted Works, (3) the exclusive right to distribute copies of the Copyrighted Works by sale, gift, rental, or lending; and (4) the exclusive the right to perform the Copyrighted Works publicly (in the case of sound recordings or other audiovisual works).

76.     The Plaintiff, DeMaggio, filed copyright registrations with the U.S. Copyright Office on or about February 14, 2013 for the registrations of the Copyrighted Works identified above in paragraph 51 under the heading "Tablet Applications." These Copyrights Works are the three Tablet Applications that the Plaintiff, DeMaggio, created to download and install the Cancer Reference Guides onto an iPad. The Plaintiff, DeMaggio, is the author and owner of the non-literal elements of the computer programming necessary to create the "look and feel" of the three Table Applications registered with the U.S. Copyright Office. These Copyrighted Works are listed

38

above under the heading "Tablet Applications." As the owner, the Plaintiff, DeMaggio, owns the exclusive rights of these Copyrighted Works, which includes, without limitation, the following rights: (1) the exclusive right to reproduce the Copyrighted Works (which includes identical or substantially similar reproductions of the Copyrighted Works), (2) the exclusive right to prepare derivative works based on the Copyrighted Works, (3) the exclusive right to distribute copies of the Copyrighted Works by sale, gift, rental, or lending; and (4) the exclusive the right to perform the Copyrighted Works publicly (in the case of sound recordings or other audiovisual works).

77.     The Plaintiff, DeMaggio, filed copyright registrations with the U.S. Copyright Office on or about February 14, 2013 for the registrations of the Copyrighted Works identified above in paragraph 51 under the heading "Websites." These resignations deal with the Copyrighted Works associated with DeMaggio's work on two separate websites. The Plaintiff, DeMaggio, is the author and owner of the non-literal elements of the computer programming necessary to create the "look and feel" of these two websites registered with the U.S. Copyright Office. These Copyrighted Works are listed above under the heading "Websites." As the owner, the Plaintiff, DeMaggio, owns the exclusive rights of these Copyrighted Works, which includes, without limitation, the following rights: (1) the exclusive right to reproduce the Copyrighted Works (which includes identical or substantially similar reproductions of the Copyrighted Works), (2) the exclusive right to prepare derivative works based on the Copyrighted Works, (3) the exclusive right to distribute copies of the Copyrighted Works by sale, gift, rental, or lending; and (4) the exclusive the right to perform the Copyrighted Works publicly (in the case of sound recordings or other audiovisual works).

78.     The Plaintiff, DeMaggio, has filed copyright registrations with the U.S. Copyright Office on or about February 14, 2013 for the registrations of the Copyrighted Works identified above in paragraph 51 under the heading "Videos." These resignations deal with the Copyrighted Works associated with DeMaggio's work creating six videos concerning various topics. The Plaintiff, DeMaggio, is the author and owner of these videos registered with the U.S. Copyright Office. These Copyrighted Works are listed above under the heading "Videos." As the owner, the Plaintiff, DeMaggio, owns the exclusive rights of these Copyrighted Works, which includes, without limitation, the following rights: (1) the exclusive right to reproduce the Copyrighted Works (which includes identical or substantially similar reproductions of the Copyrighted Works), (2) the exclusive right to prepare derivative works based on the Copyrighted Works, (3) the exclusive right to distribute copies of the Copyrighted Works by sale, gift, rental, or lending; and (4) the exclusive the right to perform the Copyrighted Works publicly (in the case of sound recordings or other audiovisual works).

79.     Upon information and belief, the Defendants are infringing on the Plaintiffs' exclusive rights in their respective Copyrighted Works associated with the registrations attached hereto as **Exhibit 2**. Upon information and belief, the Defendants are reproducing the Copyrighted Works; the Defendants are preparing derivative works based on the Copyrighted Works; and the Defendants are distributing copies of the Copyrighted Works by sale, gift, rental, or lending.

80.     The Plaintiffs have sustained, and continue to sustain, substantial injuries and damages to their exclusive rights under the U.S. Copyright Act; the Plaintiffs have also sustained, and will continue to sustain, damages from the loss of value of the exclusive rights; and the

Plaintiffs will incur irreparable harm unless this Court enjoins the Defendants from continued infringement.

81.     Defendant Jain has contributed to the copyright infringement of the others Defendants by knowingly and willingly permitting the other Defendants to infringe on the Plaintiffs' exclusive rights in their respective Copyrighted Works. Unless enjoined by this Court, Defendant Jain will continue to permit, encourage, and facilitate the infringement of the Plaintiffs' respective Copyrighted Works by the other Defendants, causing irreparable harm to the Plaintiffs.

82.     Defendant Levonyak has contributed to the copyright infringement of the others Defendants by knowingly and willingly permitting the other Defendants to infringe on the Plaintiffs' exclusive rights in their respective Copyrighted Works. Unless enjoined by this Court, Defendant Levonyak will continue to permit, encourage, and facilitate the infringement of the Plaintiffs' respective Copyrighted Works by the other Defendants, causing irreparable harm to the Plaintiffs.

## COUNT TWO
## COMMON LAW FRAUD
### (By Plaintiff Annemieke)

83.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Two**.

84.     The Defendants have committed common law fraud against Plaintiffs Annemieke because they have made false representations to Plaintiff Annemieke; these false representations were material representations; these false representations were made by the Defendants with the intent that Plaintiff Annemieke would act on them; Plaintiff Annemieke relied upon these false

representation; and the Defendants' false representations caused Plaintiff Annemieke to incur damages.

85.    More specific, in 2007, the Defendants, Jain and Levonyak, made multiple false representations to the Plaintiff, Annemieke, when they told her in early 2007 that she should shut down her successful consulting firm and move to Texas to join Dava Oncology as a founder because she would get an equity interest in Dava Oncology and, as a result, would be entitled to a "piece of the upside" when Dava Oncology was sold in about four to six years. They also made these false representations to convince Annemieke to take a salary that was significantly less than her gross income generated in 2006. Throughout the subsequent six years, the Defendants, Jain and Levonyak, made multiple false statements to the Plaintiff, Annemieke, that all of her hard work would pay off when she cashed out her equity interest in the Phantom Equity when Dava Oncology was sold. In regard to the Phantom Equity, the Defendants, Jain and Levonyak, made false representations to her that it would "vest" over time and would only be subject to cancellation or a buy-back provision only if she voluntarily left Dava Oncology before the entity was sold. The Defendants, Jain and Levonyak, never told Annemieke that they could cancel all of her Phantom Equity "at will" by terminating her employment. If Plaintiff Annemieke knew that the Defendants could terminate all of her Phantom Equity "at will," she never would have shut down her consulting firm to join Dava Oncology. If Plaintiff Annemieke knew that the Defendants never intended to honor their promises associated with the Phantom Equity, she never would have executed the Executive Agreement that bound her to a term contract. Upon information and belief, the Defendants, Jain and Levonyak, made these false statements knowing that they were false or they made these false statements recklessly as a positive assertion without

any knowledge of their truth. The Defendants, Jain and Levonyak, made these false representations with the intent that Plaintiff Annemieke would act on them. Plaintiff Annemieke relied on these false representations. These false representations caused Plaintiff Annemieke to incur damages.

**COUNT THREE**
**BREACH OF CONTRACT**
**(BY PLAINTIFF ANNEMIEKE)**

86.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Three**.

87.     On or about September 1, 2009, Plaintiff Annemieke entered into a valid, enforceable contract with Defendant Dava Oncology for the payment of a "base salary" and Phantom Equity in exchange for providing Dava Oncology with managerial, administrative, and executive services (the "Executive Agreement"). This agreement was a term contract. The initial term was for one-year with an automatic renewal for five additional one-year terms. That is, this contract would automatically renew in September for an additional one-year term unless the contract was terminated in accordance with the termination section before it renewed. Here, the Executive Agreement automatically renewed in September of 2010, September of 2011, and September of 2012. For the renewal in September of 2010, Defendant Levonyak notified Plaintiff Annemieke that, "As an acknowledgement of your hard work and dedication to the success of Dava Oncology, we are pleased to give you a salary increase of $20K...which brings your base salary to $170K/year." By 2012, the Defendants notified Plaintiff Annemieke that her annual "base salary" was raised to $190,000. Once the Executive Agreement was renewed in September of 2012 for another one-year term, Plaintiff Annemieke was entitled to a base salary of $190,000.

88.     While the covenant not-to-compete contained in this Executive Agreement is not an enforceable and valid covenant not-to-compete under Texas law, that did not render the Executive Agreement an unenforceable or invalid agreement.

89.     Plaintiff Annemieke is a proper party to sue for breach of contract under the Executive Agreement.

90.     From the effective date of the Executive Agreement through the date of the Defendants' wrongful termination of Annemieke, Plaintiff Annemieke had fully performed and/or tendered performance of her obligations under the Executive Agreement.

91.     On or about January 7, 2013, the Defendants wrongfully terminated Plaintiff Annemieke when they instructed her to leave Dava Oncology's Dallas office and to remain out of the office indefinitely. To demonstrate their decision to terminate her, the Defendants had posted an advertisement for a position to replace her within days of her termination. At that time, the Defendants had not provided Annemieke with written notice of her termination. Following her removal from Dava Oncology, Michael Ball, a duly authorized agent for the Defendants, instructed Plaintiff Annemieke that Dava Oncology had no obligation to pay her the remainder of her base salary once Dava Oncology issued her a termination notice. Around 6:30 pm on January 25, 2013, Ball sent a termination notice to Annemieke. The Defendants have failed to pay Annemieke her full base salary in accord with the terms of the Executive Agreement. This failure to pay Annemieke her full base salary constitutes a material breach of the Executive Agreement. The Defendants decision to cancel all of Plaintiff Annemieke's Phantom Equity, including the Phantom Equity earned under the terms of the Executive Agreement, also constitutes a material breach of the Executive Agreement.

92.     The Defendants' material breaches of the Executive Agreement have caused Plaintiff Annemieke to incur damages.

93.     Alternatively, to the extent that Plaintiff Annemieke cannot fully recover at law the damages for the Defendants' material breaches of the Executive Agreement, Plaintiff Annemieke seeks to recover all other relief that this Court deems appropriate, in equity, including, without limitation, a rescission of the contract, restitution, and quantum meruit.

**COUNT FOUR**
**QUANTUM MERUIT**
**(BY PLAINTIFF DEMAGGIO)**

94.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Four**.

95.     Between 2008 and 2013, Plaintiff DeMaggio provided Defendants Dava Oncology, as well as other entities under Defendant Jain's control, with valuable services as a "consultant," including, without limitation, services associated with the development of an oncologist database and other computer work. These services were provided for Defendant Dava Oncology and were accepted by Defendant Dava Oncology. Defendant Dava Oncology reasonable notice that Plaintiff DeMaggio expected compensation for the services. Indeed, Defendant Dava Oncology had promised to provide Plaintiff DeMaggio with Phantom Equity as compensation for his consultant services, but then canceled his Phantom Equity in January of 2013. Based on the Defendants assertions that DeMaggio's Phantom Equity could be terminated "at will," the consultant agreement was an illusory promise that permits Plaintiff DeMaggio to recover in equity the market value of his services provided between 2008 and 2013.

## COUNT FIVE
## DECLARATORY JUDGMENT
## COVENANT NOT-TO-COMPETE IS UNENFORCEABLE
### (BY PLAINTIFF ANNEMIEKE)

96.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Five**.

97.     The Executive Agreement executed by Plaintiff Annemieke and the Defendant, Dava Oncology, contains an unenforceable covenant not-to-compete that the Defendants have notified the Plaintiff that they intend to enforce.

98.     Based on Dava Oncology's assertion that it will enforce this covenant not-to-compete, Plaintiff Annemieke is severely limited from finding employment after her wrongful termination.

99.     This covenant not-to-compete is unenforceable for the following reasons: lack of consideration; failure of consideration; unreasonable geographic area, and unreasonable scope of prohibited activities.

100.     The consideration for the covenant not-to-compete fails because, *inter alia*, it was an interest that was not worthy of protection under Texas law, it was an illusory promise, and/or it was never provided to Plaintiff Annemieke.

101.     The geographic area is unreasonable under Texas law because it is too broad and too indefinite; more importantly, this covenant no-to-compete is greater than necessary to protect the employer's legitimate business interests.

102.     The scope of activity limited under the covenant not-to-compete is unreasonable under Texas law because it is too broad and too indefinite; more importantly, this covenant not-to-compete is greater than necessary to protect the employer's legitimate business interests.

103.    Moreover, Defendant Dava Oncology cannot enforce this covenant not-to-compete in equity because it breached a provision of the Executive Agreement that was favorable to Plaintiff Annemieke. By materially breaching the Executive Agreement, Defendant Dava Oncology has forfeited any right in equity to enforce this covenant-not-to-compete against Plaintiff Annemieke.

104.    This Court should declare the covenant not-to-compete is unenforceable.

**COUNT SIX**
**DECLARATORY JUDGMENT**
**OWNERSHIP OF UNREGISTERED COPYRIGHTED WORKS**
(BY PLAINTIFF DEMAGGIO)

105.    The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Six**.

106.    Plaintiff DeMaggio has authored a number of works that he owns and thus maintains the copyright interest in, including, without limitation, the computer programming work associated with the Dava Oncology World database (i.e. the "DOW"), as well as the computer works completed by Plaintiff DeMaggio and stored on his own server located in Dava Oncology's Dallas office, the other servers within the possession and control of Dava Oncology, and Dava Oncology's P-Drive.

107.    The Defendants have contested Plaintiff DeMaggio's copyright interests in these various items.

108.    This Court should declare that any works authored by Plaintiff DeMaggio, which are now within the possession of the Defendants, are owned by Plaintiff DeMaggio.

## COUNT SEVEN
## QUANTUM MERUIT
### (BY PLAINTIFF ANNEMIEKE)

109.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Seven**.

110.     As an alternative theory to Annemieke's contract claim under the Executive Agreement, Plaintiff Annemieke hereby asserts a cause of action, in equity, for Quantum Meruit in the event that the Executive Agreement is adjudicated as unenforceable.

111.     Plaintiff Annemieke also asserts this alternative theory of Quantum Meruit to the extent that Plaintiff Annemieke successfully rescinds the Executive Agreement—based on the Defendants' fraud, the Defendants' material breach of the Executive Agreement, and/or the adjudication that the Executive Agreement was marred by mistake—to negate the Defendants' claim that such agreement establishes the Defendants' ownership interest in any of the Copyrighted Works under the work for hire doctrine. Under this alternative theory, Plaintiff Annemieke can rescind the Executive Agreement to negate the work for hire doctrine while, at the same time, establishing an equitable claim to the reasonable market value for her services provided during the prior six years. That is, given that Plaintiff Annemieke had worked for the Defendant, Dava Oncology, at a diminished salary based on the false promise of an equity interest, Plaintiff Annemieke has a claim, in equity, to recover the market value of her services.

112.     To establish a claim for quantum meruit, Plaintiff Annemieke can establish the following. Between 2007 and 2013, Plaintiff Annemieke provided Defendant Dava Oncology with managerial, administrative, and executive services. These services were provided for Defendant Dava Oncology and were accepted by Defendant Dava Oncology. Defendant Dava Oncology had

reasonable notice that Plaintiff Annemieke expected compensation for these services. Indeed, Defendant Dava Oncology executed the Executive Agreement to provide Plaintiff Annemieke with compensation for her services in the form of base salary and Phantom Equity. To the extent that the Executive Agreement is rescinded by Plaintiff Annemieke or is otherwise found unenforceable, Plaintiff Annemieke is entitled to recover, in equity, under a theory of quantum merit, the reasonable market value of her services provided between March of 2007 and January of 2013.

**COUNT EIGHT**
**DECLARATORY JUDGMENT**
**OWNERSHIP OF UNREGISTERED COPYRIGHT WORKS**
**(BY PLAINTIFF DEMAGGIO)**

**113.** The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Eight**.

**114.** The Plaintiff, DeMaggio, owns the copyright interests for the works he has authored between 2008 and 2013, including the computer works created for the doctor database called Dava Oncology World ("DOW"). DeMaggio had created the computer code necessary to extract information from various databases into a format that would permit the Defendants to manage and access such information. This computer work is copyrightable under the U.S. Copyright Act. While DeMaggio's work is within the possession of the Defendant, Dava Oncology, he maintains the exclusive rights to the DOW.

**115.** The Defendants have lost any right to use Plaintiff DeMaggio's copyright interests by, *inter alia*, terminating Plaintiff DeMaggio's Phantom Equity and by terminating his consulting work for the Defendants.

116.     This Court should declare that all of the work authored by Plaintiff DeMaggio is owned by Plaintiff DeMaggio because the Defendants cannot establish any ownership rights to these works because the work for hire doctrine is not applicable to DeMaggio's work.

## COUNT NINE
## ACCOUNTING OF JOINT OWNERSHIP
### (BY PLAINTIFFS ANNEMIEKE AND DEMAGGIO)

117.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Nine**.

118.     The Plaintiffs created their Copyrighted Works with the intention of maintaining ownership in such works.

119.     To the extent that the Plaintiffs' respective Copyrighted Works are determined to be a joint ownership with any of the Defendants, the Plaintiffs are entitled to a full accounting of those Copyrighted Works because they own an undivided interest in the whole of the Copyrighted Works.

120.     This Court should order the Defendants to fully account to the Plaintiffs for any tangible or intangible gain obtained by the Defendants, including any monetary gain obtained by the sale or lease of such Copyrighted Works, and pay the Plaintiffs one-half of any such benefit.

## COUNT TEN
## DECLARATORY JUDGMENT
## OWNERSHIP OF COMPUTER EQUIPMENT, DOMAIN NAMES, IP ADDRESSES AND RELATED SERVERS
### (BY PLAINTIFF DEMAGGIO)

121.     The Plaintiffs incorporate by reference all of the relevant allegations contained in the prior paragraphs into **Count Ten**.

122.     The Plaintiff, DeMaggio, owns an array of computer equipment, domain names, IP addresses, and the servers connected to these IP addresses, that the Defendants have access to and

are, upon information and belief, attempting to interfere with. In particular, Plaintiff DeMaggio owns a compute server and a hard-drive attached thereto that he had placed in Dava Oncology's Dallas office. That server and hard-drive remains in the Dava Oncology Dallas office. Plaintiff DeMaggio also owns the following: (1) the domain names "scicomhq.com," "scicomhq.net," "sciencecommunications.net"; and (2) the following IP addresses (along with the servers connected with such IP addresses)—IP Address 65.39.222.54, IP Address 65.39.223.71, IP Address 65.39.222.50, IP Address 65.39.223.72, IP Address 65.39.223.70, IP Address 65.39.223.73, and IP Address 65.39.222.50.

123.    Upon information and belief, the Defendants are seeking to interfere with the Plaintiff DeMaggio's ownership interests in these items; in particular, DeMaggio believes that the Defendants are seeking to interfere with ownership interest in the various IP addresses, which are hosted by a company that Plaintiff DeMaggio has paid for.

124.    This Court should declare that Plaintiff DeMaggio is the owner of these various items and, as such, has a right to retrieve such items from the Defendants. This Court should also enjoin the Defendants from interfering with these items owned by the Plaintiff DeMaggio.

VIII.    DEMAND FOR JURY TRIAL

125.    The Plaintiff hereby requests and demands a trial by jury.

### IX.    PRAYER FOR RELIEF

**WHEREFORE**, premises considered, the Plaintiffs hereby demand the following;

1.   That this Court grant a Preliminary Injunction during the course of this lawsuit, and then enter a judgment for a Permanent Injunction, that enjoins the Defendants from the following actions:

   a.   **Enjoin Infringement of Registered Copyrighted Works.** That this Court enjoin the Defendants from directly or indirectly duplicating, copying, manufacturing, selling, lending, exchanging, trading, distributing, posting on web-portals, installing on electronic tablets like the iPads, and/or creating derivative works from any of the Plaintiffs' Copyrighted Works delineated herein in Paragraph 51.

   b.   **Enjoin Infringement of Unregistered Copyrighted Works.** That this Court enjoin the Defendants from directly or indirectly duplicating, copying, manufacturing, selling, lending, exchanging, trading, distributing, posting on web-portals, installing on electronic tablets like the iPads, and/or creating derivative works from the unregistered copyright works created by Plaintiff DeMaggio for the computer database known as the Dava Oncology World database (i.e. the "DOW");

   c.   **Enjoin Interference with Domains Owned by the Plaintiffs.** That this Court enjoin the Defendants from interfering with, or controlling in any manner, the following domains owned by the Plaintiffs: scicomhq.com, scicomhq.net, sciencecommunications.net.

   d.   **Enjoin Interference with IP Addresses Owned by the Plaintiffs.** That this Court enjoin the Defendants from interfering with, or controlling in any manner, the following IP addresses owned by the Plaintiffs and the servers connected with such IP addresses: IP Address: 65.39.222.54, IP Address: 65.39.223.71, IP Address: 65.39.222.50, IP Address: 65.39.223.72, IP Address: 65.39.223.70, IP Address: 65.39.223.73, and IP Address: 65.39.222.50.

   e.   **Return Server and Harddrive Owned by Plaintiffs.** That this Court order the Defendants to return the server owned by Plaintiff DeMaggio (with the IP Address192.168.20.15) to DeMaggio.

2.   That this Court enter judgment in favor of the Plaintiffs and against the Defendants on all matters contained in this Petition;

3.   That this Court enter judgment against the Defendants and in favor of the Plaintiffs for damages incurred by the Plaintiffs;

4.      That this Court enter judgment against the Defendants and in favor of the Plaintiffs for any relief in equity;

5.      That this Court enter a judgment against the Defendants that awards costs to the Plaintiffs;

6.      That this Court enter a judgment against the Defendants that awards the Plaintiffs pre-judgment and post-judgment interest to the fullest extent permitted under law;

7.      That this Court enter a judgment against the Defendants that awards the Plaintiffs punitive damages in accordance with federal and/or state law;

8.      That this Court enter a judgment against the Defendants that awards the Plaintiffs attorney's fees; and

9.      That this Court award all other relief that it deems just and equitable.

Dated: February 19, 2013                    *Respectfully Submitted By,*

                                            **THE LAW OFFICE OF JACK WALSH**


                                            */s/John P. Walsh*
                                            **John P. Walsh, Esq.**
                                            State Bar No. 24048867
                                            The Law Office of Jack Walsh
                                            III Lincoln Centre
                                            5430 LBJ Freeway, Suite 1200
                                            Dallas, TX 75240
                                            **Tel**: 214-773-9167
                                            **Fax**: 214-299-8668
                                            **Email**: jwalsh@lean-lawyering.com
                                            **ATTORNEY FOR PLAINTIFFS**


                                            **THE WADE LAW FIRM**

                                            **Wm. Kim Wade, Esq.**
                                            State Bar No. 20642100
                                            12700 Preston Road, Suite 265
                                            Dallas, Texas 75230

                                            **Tel**: 214-346-2946
                                            **Fax**: 214-346-2947
                                            **Email**: kwade@wadelaw.com
                                            **ATTORNEY FOR PLAINTIFFS**

## VERIFICATION OF PETITION[1]

**BEFORE ME**, the undersigned Notary Public, on this day personally appeared **Annemieke DeMaggio**, who, being by me duly sworn on oath, deposed and said that (1) the factual information included within paragraphs 12, 14, 16, 18 to 30, 33, 39 to 44, 46, 47, and 50 to 51 of the above Verified Petition are within my personal knowledge and are true and correct.


_____

**Annemieke DeMaggio**


## NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

**SUBSRIBED AND SWORN** Before Me on this ___ Day of February, 2013, to Certify Which Witness My Hand and Official Seal.


_____

**By:**_____
         Print Name of Notary

---

[1]      The Executed Verification is included in **Exhibit 3**.

## VERIFICATION OF PETITION[2]

**BEFORE ME**, the undersigned Notary Public, on this day personally appeared **Anthony DeMaggio**, who, being by me duly sworn on oath, deposed and said that (1) the factual information included within paragraphs 13, 14, 17, 23, 31-38, 45, 47-49 and 51 of the above Verified Petition are within my personal knowledge and are true and correct.


_____

Anthony DeMaggio


## NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS

**SUBSRIBED AND SWORN** Before Me on this ___ Day of February, 2013, to Certify Which Witness My Hand and Official Seal.


_____

By:_____
      Print Name of Notary

---

[2]      The Executed Verification is contained in **Exhibit 4**.